# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

JAMES C. BOYETT, JR., )
)
      Plaintiff, )
)
v. ) Case No. CIV-15-307-FHS-SPS
)
CAROLYN W. COLVIN, )
Acting Commissioner of the Social )
Security Administration, )
)
)
      Defendant. )

## REPORT AND RECOMMENDATION

The claimant James C. Boyett, Jr., requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). The claimant appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining he was not disabled. As discussed below, the undersigned Magistrate Judge RECOMMENDS that the Commissioner's decision be REVERSED and the case REMANDED to the ALJ for further proceedings.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such

severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he

---

[1] Step one requires the claimant to establish that he is not engaged in substantial gainful activity. Step two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairment *is not* medically severe, disability benefits are denied. If he *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that he lacks the residual functional capacity (RFC) to return to his past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience and RFC. Disability benefits are denied if the claimant can return to any of his past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

**Claimant's Background**

The claimant was born on July 27, 1971, and was forty-two years old at the time of the administrative hearing (Tr. 89). He completed high school and earned a college degree, and has worked as a cleanup worker, poultry hanger, and laundry worker (Tr. 76, 220). The claimant alleges he has been unable to work since an amended onset date of March 5, 2012, due to diabetes, arthritis, high blood pressure, sleep apnea, and back problems (Tr. 205, 219).

**Procedural History**

The claimant applied for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85, on March 5, 2012. His application was denied. ALJ James Bentley conducted an administrative hearing and found that the claimant was not disabled in a written opinion dated March 12, 2014 (Tr. 64-78). The Appeals Council denied review, so the ALJ's written opinion is the final decision of the Commissioner for purposes of this appeal. *See* 20 C.F.R. § 416.1481.

**Decision of the Administrative Law Judge**

The ALJ made his final decision at step five of the sequential evaluation. At step two, he determined that the claimant had the severe impairments of back pain, depression, anxiety, PTSD, and polysubstance abuse in reported remission (Tr. 28). The ALJ then determined that the claimant retained the residual functional capacity ("RFC")

to perform light work as defined in 20 C.F.R. § 416.967(b), except that he required a sit/stand option defined as a temporary change in position from sitting to standing and vice versa with no more than one change in position every half hour and without leaving the work station, and that he could perform frequent—but not constant—handling and fingering bilaterally. The ALJ then concluded that although the claimant could not return to his past relevant work, he was nevertheless not disabled because there was work he could perform, *i. e.*, small products assembler, electrical assembler, and conveyer line worker (Tr. 76-77).

**Review**

The claimant contends that the ALJ erred by: (i) failing to properly analyze the opinion of his medical providers, including his treating physician and his counselor; and (ii) failing to account for all of his impairments when formulating the RFC. The undersigned Magistrate Judge agrees with both these contentions, and the Commissioner's decision should therefore be reversed for further proceedings.

The ALJ determined that the claimant had the severe impairments of major depressive disorder, personality disorder, diabetes, hypertension with headaches, osteoarthritis with low back pain, obesity, carpal tunnel syndrome, and anxiety, as well as the nonsevere impairments of sleep apnea and reflux disease (Tr. 66-67). The claimant's treating physician, Dr. Gerald Rana, was his primary care physician from 2007 through at least 2014, treating him for various impairments that were listed in 2014 as: acquired hypothyroidism, BPH, chronic insomnia, common migraine, essential hypertension, GAD, generalized osteoarthritis (multiple sites), GERD, HTN, hyperlipidemia, infective

arthritis or ankle, low back pain, osteoarthritis involving several sites, peripheral neuropathy attributed to type II diabetes, and type II diabetes (Tr. 32).

In February 2004, the claimant was admitted to Arbuckle Memorial Hospital for being a danger to himself, and was assessed with paranoid schizophrenia, chronic, in acute exacerbation, and mood disorder, NOS (Tr. 304-306). Notes reflect that the claimant had a long history of psychiatric disorder, and when he was discharged five days later, it was recommended he have further inpatient treatment for stabilization of medication (Tr. 306). Accordingly, he was sent to Griffin Memorial Hospital for seven more days of treatment. His presumptive diagnosis was major depression, recurrent, severe, with psychosis, and he was given a global assessment of functioning (GAF) score of 21 (Tr. 361).

In April 2013, SequelCare (formerly Counseling Center of Southeast Oklahoma) prepared a letter indicating the claimant was a client from June 2005 through August 2006, and stating that he had limited progress due to multiple diagnoses. On Axis I, his diagnoses were MDD, single episode, severe with psychotic features; PTSD (chronic); and parent physical abuse of child focus (victim) (Tr. 443).

On January 8, 2011, the claimant was administered the MMPI-II test (Tr. 698). It was considered a "marginally valid" clinical profile, but that the claimant was cooperating enough to provide useful clinical scale information and was probably an acceptable indication of his personality functioning, although he showed some tendency to present an overly positive self image and to minimize personal faults (Tr. 702). Under "Symptomatic Patterns," the results indicated the claimant complained excessively of

pain and somatic problems and organized his life around what he perceived to be a physical illness, but that his complaints probably could not be explained by actual physical findings, and that he "probably receives much secondary gain from the attention of others or from services he receives" (Tr. 702). Under "Interpersonal Relations," results indicated the claimant was "[s]omewhat passive-dependent" and he tended to be a demanding person who attempted to dominate relationships through physical complaints (Tr. 702). Given the test results and the resultant pattern, the assessment noted that many with this assessment are considered "chronically maladjusted," and that he would be given a somatoform disorder diagnosis if actual multisystem physical disorders are ruled out. There was also a strong possibility that an Axis II diagnosis of Passive-Aggressive or Dependent Personality would be appropriate (Tr. 703). Psychological treatment and insight-oriented psychotherapy were not likely to be helpful, and it was noted that abuse of prescription medication should be evaluated (Tr. 703).

The claimant's therapist, Alice Caldwell, completed a number of mental status assessments regarding the claimant. On June 12, 2012, Ms. Caldwell noted the MMPI and other testing was consistent with the claimant's behaviors and attitude in daily living (Tr. 597). She noted the claimant showed a willingness in treatment, but that his patterns were inconsistent, and that his inconsistencies coupled with increasing health issues hindered his ability to handle interest or activities with follow-through or to completion; she believed he was capable of progress, but he would produce at a lower rate with or without setbacks; and she stated that his mild to moderate anxiety was heightened during times of stress beyond every day activities that does not include a workday or work hours

(Tr. 597). In December 2012, she again noted that the claimant has problems with follow through, with keeping appointments, and with caring for daily life activities on a consistent basis, and that he showed to be resistant to change but open to mental health care (Tr. 679). She noted he appeared to be stable at that time, had a history of two inpatient stays, and appeared to be managing on outpatient care. She stated he consistently had a low threshold to coping with increased tension and stress in daily life, and that he would withdraw and shut down to cope (Tr. 679). On February 22, 2013, she submitted a detailed mental RFC assessment, noting that his response to treatment was that he was willing to show for services but not consistent with his treatment, and he appeared to have difficulty coping with maintaining daily schedules (Tr. 690). She continued, stating that although he appeared to be maintaining his status while at home, he had shown patterns of inability to handle stressors in a fashion that provides productivity or making healthy choices consistently (Tr. 690). She checked twenty boxes related to the claimant's signs and symptoms, and also made notations of explanation for most of them (Tr. 691-692). She did this same thing when she noted seven areas in which the claimant was unable to meet competitive standards, including maintaining regular attendance and being punctual within customary tolerances, sustaining an ordinary routine without special supervision, and complete a normal workday and workweek without interruptions from psychologically-based symptoms (Tr. 692). She again indicated the claimant could make plans but had a limited ability to follow through (Tr. 693). She also noted that physical impairments including high blood pressure and

elevated blood sugar affected his anxiety and anger, and that (given his inconsistency) medication may or may not be helpful (Tr. 693).

On August 8, 2012, Dr. Kathleen Ward conducted a mental status examination of the claimant. Upon examination, the claimant's intellectual abilities were estimated to be above 70, and he appeared to have some deficits in social judgment and problem solving (Tr. 609). She believed the claimant to be a marginally reliable historian, and stated that his depressive symptoms were atypical and a general mood disorder was noted, adding that Axis II issues could not be ruled out and "histrionic traits would appear worth a rule-out" (Tr. 610). She assessed him with mood disorder, NOS v. Major Depressive Disorder (Tr. 610).

The claimant was admitted under emergency detention to EASTAR Health System on August 17, 2013, for voicing suicidal and homicidal thoughts, and was discharged on August 22, 2013 (Tr. 760). His medications were changed and his stress was reduced, and his discharge diagnosis was: Axis I – major depressive disorder, recurrent episode, severe with psychotic features; Axis II – personality disorder, not otherwise specified; Axis III – diabetes mellitus, hypertension, GERD, obstructive sleep apnea on continuous positive airway pressure; Axis VI - problems related to social environment, problems with primary support group; and a GAF of 55 (Tr. 760).

On September 25, 2013, Ms. Caldwell wrote a letter to the claimant's representative, noting his lengthy history of treatment and stating that his behavior, physical effects, and trouble keeping schedules consistent and timely was a recurring problem throughout the ups and downs of his life stressors. She referred to his most

recent hospital stay, and stated there had been a lack of progress since then because he had not attended regular sessions, but that he had agreed to continue with outpatient treatment, and that his history was congruent with the current show of exhibiting bouts of depressive symptoms with mixed anxiety that flux in level of interference with daily life functioning. She noted he had problems affording his prescribed medications, and that he reported an inconsistent history and current behaviors of compliance with eating habits with regard to his diabetes, and concluded that it was "a possibility that these daily decision making efforts could be [a]ffected by his current state of mental health coupled with his reported decline in physical health" (Tr. 770).

On December 12-13, 2013, Dr. Rana completed several forms regarding the claimant's ability to work. On one form, he indicated that the claimant would be absent from work one day per month due to uncontrolled blood sugars (Tr. 772). On a "Medical Opinion RE: Sedentary Work Requirements," Dr. Rana indicated that the claimant could not even perform the requirements of sedentary work, including, *inter alia*, standing/walking up to two hours in an eight-hour workday, sitting for six hours in a normal seated position, lifting/carrying ten pounds, and further indicating that he could not medically sustain normal work stress in a routine work setting on a day-to-day basis (Tr. 773). As to the claimant's pain, he indicated that work activities would increase pain and reduce the ability to perform basic mental work to such a degree as to cause inadequate functioning or total abandonment of tasks (Tr. 774). He indicated that depression, anxiety, and personality disorder affected the claimant's physical condition, that his pain or other symptoms constantly interfered with concentration and attention,

and that the claimant was incapable of even "low stress" jobs, and then concluded that the claimant was likely to be absent from work more than four days per month (Tr. 776-778).

In his written opinion, the ALJ summarized the claimant's hearing testimony, as well as much of the medical evidence in the record. As to Dr. Rana's treatment notes, the ALJ noted Dr. Rana frequently referred to the claimant's poor compliance with diet and exercise, as well as noncompliance with insulin doses due to forgetfulness and inconvenience, and a daily smoking habit despite peripheral vascular disease and peripheral neuropathy (Tr. 71). The ALJ acknowledged the MMPI test, noting that the results were marginally valid, that the claimant probably received secondary gain form attention, and that psychological treatment was unlikely to be effective (Tr. 71). He then summarized much of Ms. Caldwell's letters and assessment, specifically noting the claimant's reports of inability to afford medications, that he often refused to leave home and follow through with sessions, and that he blamed others and expressed anger to others. The ALJ discounted Ms. Caldwell's references to high and low blood sugars because she did not document them in her treatment notes and he was never hospitalized for hypo- or hyperglycemia (despite noting elsewhere in his opinion that Dr. Rana and others frequently treated the claimant for noncompliance with diabetic medication, which resulted in fluctuating blood sugars) (Tr. 73). He gave little weigh to Dr. Rana's opinion as internally and externally inconsistent because (i) in one place he indicated the claimant would miss one day of work a week and in another four days; (ii) he listed generalized anxiety disorder and uncontrolled blood sugar as disabling, but treatment records reflected noncompliance with insulin and diet and exercise regimens; (iii) a January 24,

2013 treatment note found no anxiety, depression, sadness, sleep disturbance, or suicidal thought; and (iv) he was not a psychologist or endocrinologist (Tr. 75). As to Ms. Caldwell's opinion, the ALJ noted she was an "other source," and he was not required to give significant weight to her opinion, but faulted her for failing to provide "clinical signs" to support her conclusions and failing to provide a basis for her conclusions, but he gave her opinion "some weight" by limiting the claimant to simple tasks with routine supervision and only occasional contact with co-worker, supervisors, and the general public (Tr. 75).

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional. . . . An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) [internal citation omitted] [emphasis added], *citing Goatcher v. United States Department of Health & Human Services*, 52 F.3d 288, 290 (10th Cir. 1995). Those factors are: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins,* 350 F.3d at 1300-01, *citing Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001) [quotation

omitted]. Medical opinions from a treating physician are entitled to controlling weight if they are "'well-supported by medically acceptable clinical and laboratory diagnostic techniques . . . [and] consistent with other substantial evidence in the record.'" *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004), *quoting Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). Even if a treating physician's opinion is not entitled to controlling weight, the ALJ must determine the proper weight to give it by analyzing the factors set forth in 20 C.F.R. § 416.927. *Langley*, 373 F.3d at 1119 ("Even if a treating physician's opinion is not entitled to controlling weight, '[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in § [416.927].'"), *quoting* Soc. Sec. R. 96-2p, 1996 WL 374188, at *4 (July 2, 1996). Finally, if the ALJ decides to reject a treating physician's opinions entirely, "[s]he must . . . give specific, legitimate reasons for doing so[,]" *Watkins*, 350 F.3d at 1301 [quotation marks omitted; citation omitted], so it is "clear to any subsequent reviewers the weight [she] gave to the treating source's medical opinion and the reasons for that weight." *Watkins*, 350 F.3d at 1300 [quotation omitted].

Here, the ALJ attempted to address the requisite factors, but his analysis falls short because the ALJ focused on one treatment note—eight months prior to a hospitalization for suicidal ideation in which Dr. Rana noted no anxiety—to say that Dr. Rana had not treated the claimant's anxiety recently. This is improper picking and choosing. *See, e. g., Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability."), *citing Robinson v. Barnhart*, 366 F.3d 1078,

1083 (10th Cir. 2004) and *Hamlin*, 365 F.3d at 1219 (10th Cir. 2004). *See also Briggs ex rel. Briggs v. Massanari,* 248 F.3d 1235, 1239 (10th Cir. 2001) ("Although the ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision, especially when that evidence is 'significantly probative.'"). Moreover, he repeatedly cited the claimant's noncompliance with treatment to support a finding of nondisability, without addressing whether that noncompliance was due to his severe mental impairments, as indicated by Ms. Caldwell's repeated assessments, as well as the MMPI. In addition to improper picking and choosing, the parsing of the record further demonstrates that the ALJ failed to consider *all* the claimant's impairments *in combination*. *Hargis v. Sullivan*, 945 F.2d 1482, 1491 (10th Cir. 1991) ("A claimant's mental impairments must also be evaluated in combination with the effects of other impairments.").

Furthermore, the ALJ recited places in the record where the claimant reported that his insurance limited his ability to fill all of his medications at the same time on a regular basis, but appeared to hold this against him in the form of faulting him for noncompliance. The undersigned Magistrate Judge notes that this inability to afford medication should not be held against him. *See, e. g.*, *Thomas v. Barnhart*, 147 Fed. Appx. 755, 760 (10th Cir. 2005) ("'[T]he medicine or treatment an indigent person cannot afford is no more a cure for his condition than if it had never been discovered . . . To a poor person, a medicine that he cannot afford to buy does not exist.'") [unpublished opinion], *quoting Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

Social Security regulations likewise provide for the proper consideration of "other source" opinions such as that provided by Ms. Caldwell herein. *See, e. g., Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007) (noting that other source opinions should be evaluated with the relevant evidence "on key issues such as impairment severity and functional effects" under the factors in 20 C.F.R. §§ 404.1527, 416.927), *quoting* Soc. Sec. Rul. 06-03p, 2006 WL 2329939 at *3, *6 (Aug. 9, 2006) ("[T]he adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."). The factors for evaluating opinion evidence from "other sources" include: (i) the length of the relationship and frequency of contact; (ii) whether the opinion is consistent with other evidence; (iii) the extent the source provides relevant supporting evidence; (iv) how well the source's opinion is explained; (v) whether claimant's impairment is related to a source's specialty or area of expertise; and (vi) any other supporting or refuting factors. *See* Soc. Sec. Rul. 06-03p at *4-5; 20 C.F.R. § 404.1527(d). Although the ALJ indicates he was cognizant of these factors, he nevertheless failed to apply them, instead citing a lack of "clinical signs in support of her conclusions," and ignoring her reliance on the MMPI results (a clinical test) as well as her own treating relationship with the claimant. The ALJ thus failed to apply the appropriate analysis to Ms. Caldwell's opinion evidence. *See, e. g., Anderson v. Astrue*, 319 Fed. Appx. 712, 718 (10th Cir. 2009) ("Although the ALJ's decision need not include an *explicit discussion* of each factor, the record must

reflect that the ALJ *considered* every factor in the weight calculation.") [emphasis in original].  *See, e. g., Clifton*, 79 F.3d at 1010 ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.") *citing Vincent ex rel. Vincent v. Heckler*, 739 F.3d 1393, 1394-1395 (9th Cir. 1984).

Because the ALJ failed to properly assess the evidence in determining the claimant's RFC, including the treating physician opinion evidence and other source evidence, the decision of the Commissioner should be reversed and the case remanded to the ALJ for further analysis of the claimant's RFC.  If on remand there is any adjustment to the claimant's mental RFC, the ALJ should re-determine what work, if any, the claimant can perform and ultimately whether he is disabled.

## Conclusion

The undersigned Magistrate Judge finds that correct legal standards were not applied by the ALJ and that the decision of the Commissioner is therefore not supported by substantial evidence.  Accordingly, the Magistrate Judge RECOMMENDS that the ruling of the Commissioner of the Social Security Administration be REVERSED and the case REMANDED for further proceedings not inconsistent herewith.  Any objections to this Report and Recommendation must be filed within fourteen days.  *See* Fed. R. Civ. P. 72(b).

**DATED** this 31st day of August, 2016.

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**